```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X

UNITED STATES OF AMERICA,
                                        MEMORANDUM AND ORDER
        - against -                        19-CR-5(KAM)


MARCUS WILLIAMS,
            Defendant.

-----------------------------------X
```
KIYO A. MATSUMOTO, United States District Judge:

Before the court is a motion for compassionate release filed by defendant Marcus Williams, who is currently serving a 33-month sentence at the Federal Correctional Institution Pollock, in Pollock, Louisiana[1] ("FCI Pollock"), to modify his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  (*See* ECF Nos. 45, Letter Motion to Reduce Sentence from Mr. Williams ("Def. Mot."); 48, Letter Supplement in Support of Motion to Reduce Sentence ("Def. Supplement"); 53, Reply to Gov't Opposition ("Def. Reply").)  Mr. Williams moves for a sentence reduction based on his medical condition as related to the global COVID-19 pandemic and his isolated conditions of confinement.  (*See* Def. Mot.; Def. Supplement.)  The Government opposes Mr. William's motion.  (*See* ECF 51, Government Response

---

[1] From the time of Mr. William's motion to this court's order, Mr. Williams was transferred to FCI Pollock, a medium security facility, from FCI Pollock, a high security facility.

1

in Opposition of Motion for Sentence Reduction ("Gov't Opp.").) For the reasons set forth below, Mr. William's motion is respectfully DENIED.

## BACKGROUND

On December 2, 2018, the New York Police Department ("NYPD") arrested Mr. Williams in connection with a shooting in the vicinity of Putnam Avenue and Lewis Avenue in Brooklyn, New York. (ECF No. 27, Presentence Investigation Report ("PSR"), ¶ 3.) NYPD officers responded to numerous 911 calls and observed Mr. Williams standing in front of a private residence attempting to rack the slide of a handgun.[2] (*Id.*) After approaching the defendant, an officer physically engaged Mr. Williams in effectuating an arrest and while doing so, heard the sound of a metal object hitting the concrete floor. (*Id.* ¶ 4.) After the defendant was placed under arrest, an officer observed a FIE Titan .25-millimeter caliber pistol on the concrete floor. (*Id.*) Shortly thereafter, officers canvassed the area and discovered two shell casings on Putnam Avenue (where the initial shooting occurred) that matched the pistol seized. (*Id.* ¶ 5.) As confirmed by forensic analysis, the pistol was operable, manufactured outside of New York, and the serial number on the pistol was obliterated. (*Id.* ¶ 6.) Surveillance footage from a

---

[2]   This refers to a maneuver that loads the handgun with a bullet from the magazine.  (PSR ¶ 3.)

2

residence on Putnam Avenue depicted the defendant holding a handgun and shooting at other individuals. (*Id.*)

On March 13, 2019, Mr. Williams pleaded guilty before this court to a single-count indictment charging one count of possession of a firearm after previously having been convicted of a felony. (*Id.* ¶¶ 1, 11.)

Mr. Williams was sentenced by this court on August 13, 2019 to 33 months' imprisonment and two years' supervised release, with credit for time served since defendant's December 2, 2018 arrest. (ECF Nos. 34 Sentencing Transcript ("Sent. Tr."), 35.) At the sentencing proceeding, this court independently calculated the advisory U.S. Sentencing Commission Guidelines range of imprisonment to be 37 to 46 months' imprisonment. (Sent. Tr. at 55.) The court found that a downward variance from the Guidelines range was warranted because defendant was confined in harsh conditions at the Metropolitan Detention Center ("MDC") during the January and February 2019 blackout. (*Id.* at 57.) In addition to the 33 months' term of incarceration, Mr. Williams was also sentenced to two years of supervised release to follow his term of imprisonment and forfeiture of the FIE Titan .25-millimeter caliber pistol and the ammunition seized on December 2, 2018. (*Id.* at 57-59.) Mr. Williams is currently incarcerated at FCI

3

Pollock.  Mr. Williams projected release date is May 2, 2021. (Gov't Opp., Ex. A, Inmate Investigative Report at 3.)

On December 3, 2020, Mr. Williams filed a *pro se* motion to reduce his sentence pursuant to the First Step Act citing his COVID-19 illness contracted while in custody.  (*See* Def. Mot.)  Counsel for Mr. Williams then filed a supplemental letter in support of Mr. Williams's motion for a sentence reduction on January 22, 2021.  (*See* Def. Supplement.)  On February 12, 2021, the Government filed an opposition to Mr. Williams's motion for a sentence reduction.  (*See* Gov't Opp.). On February 26, 2021, counsel for Mr. Williams filed a reply to the Government's opposition, which emphasized the isolated conditions of confinement that were imposed as precautions related to the COVID-19 pandemic.  (*See* Def. Reply.)

**LEGAL STANDARD**

The First Step Act creates an exception to the general prohibition against modifying a term of imprisonment once it has been imposed.  Pursuant to the First Step Act, defendants may move a court to "reduce" a term of imprisonment, which the court may grant "after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable," upon a finding that "extraordinary and compelling reasons warrant such a reduction[.]"  18 U.S.C. § 3582(c)(1)(A)(i).  The court may only modify a sentence "upon motion of the defendant after the

4

defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

Congress has delegated responsibility to the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(t). The Sentencing Commission has determined that a defendant's circumstances meet the extraordinary and compelling standard, *inter alia*, when the defendant is "suffering from a terminal illness" or a "serious physical or medical condition ... that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," or if, in the judgment of the BOP, the defendant's circumstances are extraordinary and compelling for "other reasons." U.S.S.G. § 1B1.13(1)(A) & Application Note 1(A), (D). In addition, the Sentencing Commission counsels that a court should reduce a defendant's sentence only after determining that "[t]he defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

The Second Circuit held that district courts have "discretion to consider whether any reasons are extraordinary

and compelling," and that "[n]either Application Note 1(D), nor anything else in the now-outdated version of [U.S. Sentencing Commission] Guideline § 1B1.13, limits the district court's discretion" to do so. *United States v. Brooker*, No. 19-cr-3218, 2020 WL 5739712, at *7 (2d Cir. Sept. 25, 2020).[3] A "district court's discretion in this area—as in all sentencing matters—is broad." *Id.* at *8. "The only statutory limit on what a court may consider to be extraordinary and compelling is that 'rehabilitation *alone* shall not be considered an extraordinary and compelling reason.'" *Id.* (quoting 28 U.S.C. § 994(t) (emphasis in original, alterations omitted)).

"The defendant carries the burden of showing that he or she is entitled to a sentence reduction under the statute." *United States v. Schultz*, 2020 WL 2764193, at *2 (W.D.N.Y. May 28, 2020) (citing *United States v. Ebbers*, 432 F. Supp. 3d 421, 426 (S.D.N.Y. 2020)). "Even if a defendant carries this burden, district courts have broad discretion in deciding whether to grant or deny a motion for a sentence reduction." *United States v. Cato*, No. 16-cr-326 (ARR), 2020 WL 5709177, at *3 (E.D.N.Y. Sept. 24, 2020) (internal quotation marks omitted).

---

[3] The government argues that *United States v. Brooker* was "wrongly decided," and that the First Step Act did not "purport to expand the basis for compassionate release beyond the categories identified by the Sentencing Commission in" the Guidelines. (Gov't Opp. at 5 n.5.) The government is entitled to make its argument, but that argument was rejected by the Second Circuit, and this court is bound to apply Second Circuit law.

**DISCUSSION**

The government does not dispute that Mr. Williams exhausted the administrative remedies available to him. (*See* Gov't Opp. at 4 n.4.) The question before the court, therefore, is whether Mr. Williams has shown "extraordinary and compelling reasons" that would warrant a reduction of his custodial sentence, after "considering the factors set forth in section 3553(a) to the extent that they are applicable[.]" 18 U.S.C. § 3582(c)(1)(A)(i).

## I. Mr. Williams's Medical Conditions and Conditions of Confinement

Mr. Williams moves for a reduction of his sentence on two grounds: (1) his medical conditions and fear of re-contracting COVID-19, and (2) the conditions of his confinement. First, in his application to the court, the defendant indicated that he had contracted COVID-19 suffered painful symptoms, and recovered. (Def. Mot. at 1-2.) Mr. Williams described the conditions of his incarceration at FCI Pollock and alleged that (1) he did not receive proper medical care when he was ill with COVID-19; (2) he was not re-tested for COVID-19 after being quarantined for 14 days; (3) the quality of the drinking water at FCI Pollock was subpar; and (4) he was at risk of being re-infected with COVID-19. (*Id.* at 1-3.) The Government counters that defendant's medical history and federal Bureau of Prisons

("BOP") medical records do not establish that there are extraordinary and compelling reasons justifying early release from incarceration. (Gov't Op. at 6-7.)

Second, through a supplemental letter filed by his counsel, Mr. Williams argues a reduction in his sentence is warranted because over the last year he has "suffered continuous isolation -- first in segregated housing, then in medical quarantine, and now in the restrictive COVID-19 conditions of general population -- that goes far beyond what a typical period of imprisonment contemplates." (*See* Def. Supplement at 3.) Mr. Williams argues that these conditions of confinement for the last year qualify as "exceptional and compelling reasons" for a sentence reduction. (*Id.* at 4.) The Government argues these measures were taken to ensure Mr. Williams's safety, following his transfer to another facility after Mr. Williams advised the BOP that he was a member of a gang (a statement he now claims is false), the resulting quarantine following an inmate's arrival at an institution, his isolation after he contracted COVID-19, and periodic restrictions due to COVID-19 outbreaks. (*See* Gov't Opp. at 7.) For the reasons set forth below, the court concludes that Mr. William's medical condition and conditions of confinement fail to establish "extraordinary and compelling reasons" warranting a sentence reduction.

### A. Medical Conditions

Mr. Williams's counsel in their supporting supplement, asserts that defendant's request for a sentence reduction is not based on risks of a COVID-19 infection but argues the pandemic is "worth mentioning" due to the possibility of re-infection. (Def. Supplement at 4 n.3.) Moreover, in his *pro se* letter to the court, Mr. Williams appears to a request a sentence reduction, in part, "before [his] health get[s] wors[e]," and thus the court will address Mr. Williams's medical history. (Def. Mot. at 4.)

The court first notes that Mr. Williams tested positive for COVID-19 on October 6, 2019 at FCI Pollock. (ECF No. 49, BOP Medical Records Excerpt ("Med. Rec.") at 64-65.) Based on medical records dated October 9, 2020, Mr. Williams was fortunately largely asymptomatic, and he denied experiencing fever, chills, body aches, cough, loss of taste or smell, and/or diarrhea. (*See* Med. Rec. at 27.) Mr. Williams was placed in isolation and received follow-up medical visits. (*Id.* at 16-24.) On October 10, 2020, a nurse advised the defendant about his care and defendant again denied having symptoms and he was afebrile. (*Id.* at 23.) On October 12, 2020, the defendant again denied having symptoms and he did not have a fever. (*Id.* at 16.) On October 19, 2020, the medical records state that the defendant "completed isolation and remains symptom free and

9

afebrile." (*Id.* at 2.)  Thus, the medical records indicate that Mr. Williams was not in any acute distress while he was infected with COVID-19.  (*Id.* at 1-29)

The court is sympathetic that Mr. Williams had to endure a bout with COVID-19 and is relieved that Mr. Williams has recovered.[4]  Nonetheless, the court concludes that Mr. Williams's history with COVID-19 and any risks associated with his medical condition do not present "extraordinary and compelling reasons" warranting a reduction of Mr. Williams's below-Guidelines sentence.  According to his medical records, Mr. Williams is 25 years-old and appears to be generally healthy.  Although Mr. Williams was previously diagnosed with depression, he has refused to take medication in the past.  (*See* Med. Rec. 68-70.)  The court is mindful of Mr. Williams's experience with COVID-19 but is also mindful that a showing of an "extraordinary and compelling" reason is necessary to modify a sentence.

District courts in this Circuit have held that contracting COVID-19 in prison, by itself, does not constitute an "extraordinary and compelling" reason warranting a sentence

---

[4] Mr. Williams states that he "recovered [from] the first outbreak," but also states that he is still having some health issues such as muscle pain, severe headaches, and chest pain. (Def. Mot. at 2.)  The court notes that the post-infection symptoms described by Mr. Williams appear to be inconsistent with his medical records describing his experience with COVID-19 as discussed above.

reduction. *See United States v. Gray*, No. 08-cr-421 (BMC), 2021 WL 293380, at *3 (E.D.N.Y. Jan. 28, 2021) (denying compassionate release to defendant who had contracted COVID-19 in prison who was asymptomatic and who did not suffer from increased health risks); *United States v. Davis*, No. 12-cr-712, 2020 WL 3790562, at *3 (S.D.N.Y. July 7, 2020) (denying compassionate release because "the speculative risk of reinfection" was neither "extraordinary" nor "compelling" within the meaning of Section 3582). Further, Mr. Williams's counsel conceded that Mr. Williams "does not suffer from preexisting conditions that put him at risk of complications from a COVID-19 infection" and that when he was infected, he was largely asymptomatic. (*See* Def. Supplement at 4 n.3.) To be sure, medical records also confirm that Mr. Williams did not suffer from acute distress while he was ill and do not show any preexisting conditions in risk categories recognized by the Centers for Disease Control and Prevention. For these reasons, the court concludes that Mr. William's medical conditions do not provide "extraordinary and compelling" reasons warranting release.

**B. Conditions of Confinement**

Next, Mr. Williams argues that his conditions of confinement for the previous year qualify as "extraordinary and compelling reasons" for a sentence reduction. (Def. Supplement at 3-4.) Over the last year, Mr. Williams has spent a

11

significant amount of time in isolation while incarcerated. On January 6, 2020, Mr. Williams was first placed in segregated housing at FCI Schuylkill because he was identified to be at risk of assault from gang members. (ECF No. 40 at 1.) He had advised officials at FCI Schuylkill that he was a member of a gang that had issues with rival gang members, knowing it was likely to result in a transfer to another facility. (Gov't Opp., Ex. A, Inmate Investigative Report at 3.) Mr. Williams was held in solitary confinement at Schuylkill. (ECF No. 48, Ex. B, BOP Institutional Records.) Four months later, on April 30, 2020, Mr. Williams was designated to be transferred to FCI Pollock, but the transfer did not occur until September 2020, due to restrictions on inmate movement during the COVID-19 pandemic. (*Id.*) During and after the transfer from FCI Schuylkill to FCI Pollock, Mr. Williams was kept in quarantine, as part of COVID-19 protocols. (Def. Supplement at 2.) On October 9, 2020, while still in quarantine following his transfer to FCI Pollock, Mr. Williams tested positive for COVID-19. (*Id.*) After recovering from COVID-19, on October 19, 2020, Mr. Williams was cleared to rejoin the general population, but defendant argues that the general population was much like segregated housing, due to the facility restrictions implemented to prevent the spread of COVID-19. (Def. Supplement at 2.)

12

Although the court recognizes the notable hardships the COVID-19 pandemic has had on prison populations, the court concludes that Mr. William's conditions of confinement were largely imposed in the interest of the institutional safety and security of inmates and staff. First, on January 6, 2020, Mr. Williams was placed in segregated housing at FCI Schuylkill because the Special Investigative Services Department received information that Mr. Williams was a potential target of gang violence. (*See* Gov't Opp., Ex. A, Inmate Investigative Report at 2.) After an interview during which Mr. Williams confirmed his membership in a gang,[5] the BOP moved him to segregated housing in the interest of his own safety. (Def. Supplement at 3.) Second, on September 22, 2020, Mr. Williams was placed in medical quarantine during and following his transfer from FCI Schuylkill to FCI Pollock. (*Id.* at 2.) Third, Mr. Williams was cleared to rejoin the general population at FCI Pollock, but argues that facility restrictions made general population much like segregated housing and quarantine. (*Id.*)

Here, the court concludes that Mr. William's conditions of confinement were largely imposed in the interest of his own safety and the safety of other BOP inmates and staff.

---

[5] Mr. Williams's counsel has denied his involvement in any gangs, instead stating Mr. Williams learned that declaring membership would result in a transfer to another facility and that he thus "took advantage of that opportunity" because gang disputes had made FCI Schuylkill "violent and dangerous." (Def. Reply at 3.)

Mr. Williams's instances of medical quarantine demonstrate the BOP's efforts at limiting the spread of COVID-19 following the BOP's modified operations implemented since the beginning of the pandemic.[6] Furthermore, his solitary confinement at FCI Schuylkill was the result of the Special Investigative Services Department's threat assessment that Mr. Williams was a potential target of gang violence. (*See* Gov't Opp., Ex. A, Inmate Investigative Report at 2.) The court finds that these restrictions were reasonably necessary measures for the BOP to mitigate the spread of the COVID-19 virus and to protect individuals in its custody from violence. Thus, contrary to Mr. Williams's arguments, his conditions of confinement do not constitute "extraordinary and compelling" reasons for a reduction in his sentence.

The court is concerned for all inmates and recognizes the challenges of incarceration during an unprecedented global pandemic, but the court can only modify a sentence if "extraordinary and compelling reasons" are presented. Mr. Williams, despite his recent case of COVID-19 and history of depression, is a healthy 25-year-old who is incarcerated at a facility that currently has 17 active confirmed cases of COVID-

---

[6] *See* BOP Modified Operations, *available at* https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed Mar. 17, 2021).

14

19 (1 inmate and 16 staff members).[7] For these foregoing reasons, Mr. Williams has failed to demonstrate "extraordinary and compelling reasons" arising from his health or the conditions at FCI Pollock, weighing in favor of a sentence reduction.

## II. The Sentencing Section 3553(a) Factors

Even if extraordinary and compelling reasons existed, the Section 3553(a) factors counsel against reducing Mr. Williams's sentence. In assessing a motion for compassionate release, the court must also give consideration to the relevant sentencing factors set forth in Title 18 United States Code Section 3553(a), which include, *inter alia*: "the nature and circumstances of the offense," "the history and characteristics of the defendant," and "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[.]" 18 U.S.C. § 3553(a)(1)-(2).

Counsel for Mr. Williams highlights his admirable reentry plan which includes returning to his mother's apartment to begin a paying, home-based job with Run Music LLC, a music label, as an assistant responsible for fielding phone calls and planning day-to-day logistics. (Def. Supplement at 4.) The

---

[7] *See* COVID-19 Cases, Federal Bureau of Prisons, *available at* https://www.bop.gov/coronavirus/index.jsp (last accessed Mar. 22, 2021).

15

court recognizes Mr. Williams's reentry plan and commends Mr. Williams for his commitment to rehabilitation and reintegration into society.

Notwithstanding his reentry plan, however, the court concludes that granting Mr. Williams's sentence reduction now, after he has served approximately 30 ½ months of his 33-month sentence, would not "promote respect for the law," nor "provide just punishment for the offense[s.]" 18 U.S.C. § 3553(a)(2)(A). Here, Mr. Williams admitted to possessing a firearm after being previously convicted of a felony. (*See* ECF No. 23.) Mr. Williams fired a pistol on a crowded street and video evidence depicts Mr. Williams firing his weapon at other individuals. (PSR ¶ 6.) Mr. Williams was granted a sentencing variance for pre-trial detention as well as a below Guidelines sentence of 33 months' imprisonment due to the harsh conditions at the MDC in Brooklyn during a blackout in January and February 2019. (*See* ECF Nos. 34, 35.) The court concludes that Mr. Williams's criminal history is significant, and the nature and circumstances of Mr. Williams's offense were serious and further, that the seriousness of the offense undermines Mr. Williams's claim that he will not pose a risk of danger to the community if released.

The court is hopeful that Mr. Williams will be able to make the transition to a law-abiding life when his sentence is

completed and is optimistic about his future given his youth and apparent motivation. But the court must consider whether granting defendant's application would promote respect for the law and provide just punishment, and concludes that it would not. Moreover, the court must consider the dangers to the community and finds that the circumstances of Mr. Williams's offense of being a felon in possession of a firearm after being previously convicted of a felony are serious. Accordingly, the sentencing factors set forth in Section 3553(a), which the court considered at the time of sentencing as warranting a custodial sentence of 33 months' imprisonment, do not warrant a reduction in sentence at this time.

## CONCLUSION

For the foregoing reasons, Mr. Williams's motion for a sentence reduction is respectfully DENIED. Mr. Williams has not made a showing of "extraordinary and compelling reasons" warranting a modification of his sentence, nor do the statutory sentencing factors weigh in favor of a modification.

SO ORDERED.

_____/s/_____ __ _____
Hon. Kiyo A. Matsumoto
United States District Judge
Eastern District of New York

Dated: Brooklyn, New York
       March 22, 2021